F I L E D
United States Court of Appeals
Tenth Circuit

MAY 28 1999

PATRICK FISHER
Clerk

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

GLENN L. GREEN,

Defendant - Appellant.

No. 98-3243

---

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## (D.C. NO. CR-97-10164)

---

Brian K. Holland, Holland, Kaplan & Pagliuca, P.C., Denver, Colorado, for appellant.

Lanny D. Welch, Assistant United States Attorney (Jackie N. Williams, United States Attorney, with him on the brief), Wichita, Kansas, for appellee.

---

Before **ANDERSON**, **McWILLIAMS**, and **LUCERO**, Circuit Judges.

---

**ANDERSON**, Circuit Judge.

---

Glenn L. Green was convicted by a jury of two counts of possession of methamphetamine with intent to distribute and one count of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841. Green appeals these convictions, arguing that (1) the officers who investigated him, obtained warrants to search his residence, executed those warrants, and discovered incriminating evidence were acting outside their jurisdiction, and that therefore the searches violated the Fourth Amendment to the U.S. Constitution, and (2) the government improperly refused, until trial, to disclose the identity of a confidential informant. For the reasons stated below, we affirm.

## BACKGROUND

In late October or early November 1997, officers of the Wichita Police Department (WPD) received information from a confidential informant that Green was engaged in narcotics distribution at his residence. At that time, Green resided outside the city limits of Wichita, in rural Butler County, Kansas.[1] On November 12, 1997, in an attempt to corroborate the information received from the informant, WPD Officer Chris Bannister set up a "controlled buy" of narcotics at Green's house in Butler County. WPD officers thoroughly searched the

_____

[1]Wichita is the county seat of Sedgwick County, Kansas. Butler County is adjacent to Sedgwick County. At all times relevant to this appeal, Green resided between Andover, Kansas and Augusta, Kansas, in rural Butler County.

informant's person and ascertained that she had no narcotics on her person. Bannister gave the informant $1100 in cash, which had been photocopied to record the serial numbers. In the early evening of November 12, Bannister and the informant traveled together, in the informant's vehicle, to Green's residence in Butler County, which was already under surveillance by several WPD officers. While Bannister hid in the vehicle, the informant entered Green's house and returned in a few minutes with a small package. Bannister and WPD officer Frank Cook, who was conducting surveillance, both saw the informant with Green as she exited the residence. The informant then got back into the car with Bannister and drove off. A few minutes later, the informant gave the small package to Bannister; the contents of the small package were determined to be methamphetamine.

Bannister then set about obtaining a search warrant for Green's Butler County residence. He contacted Bob Bartlett, a member of the Butler County Drug Task Force, [2] who directed him to the Butler County district attorney and a Butler County judge. Bannister proceeded to fill out an application for a Butler

_____

[2]After his conviction, Green filed a motion for a new trial in the district court, alleging that new evidence had come to light that Bannister had, contrary to his testimony at the suppression hearing, not sought out the assistance of Butler County officials until after he had obtained the November search warrant. Appellant's App. Tab S, at 2. However, the government strongly disputed the accuracy of this assertion, Appellants' App. Tab T, at 3, and, in any event, no such evidence was ever introduced into the record.

County search warrant, complete with an affidavit describing the controlled buy. Butler County Judge John Jaworsky signed the warrant late in the evening on November 12. The warrant was addressed to "Officer John C. Bannister #1624, Wichita Police Department, or any peace officer of the State of Kansas," and authorized a search of Green's residence for methamphetamine and related items. Appellant's App. at 40.

After the search warrant was obtained, WPD officers waited for Green to leave his house. About 11:30 P.M., Green was seen leaving the residence in his truck. Two WPD officers stopped Green's truck and arrested Green. In his truck and/or on his person, WPD officers found and seized a ziploc bag containing methamphetamine, over $1400 in cash, a cellular phone, and a pager. Officers also confiscated Green's keys.

A few hours later, in the early hours of November 13, WPD officers executed the Butler County search warrant. Butler County's Bartlett was present at the execution of the warrant, as were two other Butler County detectives. Using the keys found in Green's truck, the officers entered the residence. Inside the residence, officers found two ounces of methamphetamine in a plastic drink holder, as well as other small amounts of methamphetamine at other locations in the house. Officers also discovered various kinds of drug paraphernalia, including scales, plastic wrap, and baggies, as well as a firearm and two bundles

of cash. Some of this money was later determined to be part of the $1100 that Bannister had given the informant. Officers also discovered a surveillance camera mounted in one of the upstairs bedrooms of the house. This camera was pointed at an old pickup truck in the driveway of the house, and the camera was set up so that a person in the living room of the house could view, on the television screen, the truck in the driveway. Officers subsequently searched the truck, and discovered 12-14 ounces of methamphetamine in a jacket under the front seat of the truck.

Approximately one month later, the same WPD officers received information from the same informant that Green was again conducting narcotics sales out of his residence. On December 10, 1997, Bannister conducted another largely identical controlled buy, using the same confidential informant, at the Butler County residence. The informant again entered the house with photocopied money given to her by WPD officers, and returned with one ounce of methamphetamine. This time, however, Bannister did not contact Butler County authorities or ask a Butler County judge for a search warrant. Rather, Bannister contacted an Assistant United States Attorney, who helped Bannister seek a federal search warrant from a United States Magistrate Judge. Bannister completed an affidavit to support his application for a federal search warrant. In that affidavit, Bannister described the results of the November search of the

residence and the results of the second controlled buy conducted earlier that evening. Bannister further stated in his affidavit that, during the controlled buy, Green told the informant that he would be coming into Wichita to purchase cocaine at a specified address that same evening. Magistrate Judge Karen Humphreys issued the warrant at 12:45 A.M. on December 11. The warrant was addressed to "John Bannister and any Authorized Officer of the United States."[3] Appellant's App. at 44.

While Bannister was obtaining the warrant, other WPD officers observed Green leave his residence in a van. Green proceeded to drive into Wichita, to precisely the address identified by the informant as the address at which Green was to purchase drugs, and to which Green told her, during the controlled buy, that he would travel that evening. Officers observed Green pull into the driveway at this Wichita address, exit his vehicle, and enter the front door of the house. Green was in the house for approximately one hour. After Green left the Wichita address, officers followed Green's vehicle until they observed him fail to signal a

---

[3]Green does not argue, either here or before the district court, that this warrant violated Fed. R. Crim. P. 41(c), which requires that federal search warrants "be directed to a civil officer of the United States authorized to enforce or assist in enforcing any law thereof or to a person so authorized by the President of the United States." Therefore, any such argument is deemed waived, Walker v. Mather (In re Walker), 959 F.2d 894, 896 (10th Cir. 1992); Jordan v. Bowen, 808 F.2d 733, 736 (10th Cir. 1987), and may not have led to suppression of the fruits of that warrant in any event, see United States v. Pennington, 635 F.2d 1387, 1389-91 (10th Cir. 1980).

turn. At that point, WPD officers stopped Green's vehicle, arrested Green, and searched both Green and the vehicle. In the passenger compartment of the vehicle and/or on Green's person, officers discovered a plastic bag containing one ounce of white powder later determined to be cocaine, and over $1700 in cash ($300 of which was determined to be photocopied money from the second controlled buy). Officers also confiscated Green's keys.

Using the keys confiscated at the traffic stop, WPD officers returned to Green's Butler County residence and again entered it and searched it, pursuant to the federal warrant. This time, however, they were unassisted by Butler County law enforcement officers, but they were accompanied by Bruce Watts, a WPD officer who had apparently been granted statewide authority to conduct narcotics investigations by the Attorney General of Kansas. A search of the house yielded two ounces of methamphetamine and various drug paraphernalia, including scales, razor blades, and a mirror. Officers also discovered a semiautomatic pistol, as well as a new surveillance camera trained on the front yard of the house.

Based on the evidence discovered in the various searches, a federal grand jury returned a multiple-count indictment against Green, charging him with (1) possessing, with intent to distribute, 450 grams of methamphetamine discovered in the November search of the house, in violation of 21 U.S.C. § 841; (2) possessing, with intent to distribute, one ounce of cocaine discovered in the

December search of his vehicle, in violation of 21 U.S.C. § 841; and (3) possessing, with intent to distribute, 55 grams of methamphetamine discovered in the December search of his house, in violation of 21 U.S.C. § 841. [4]

In February 1998, Green moved to suppress the evidence discovered in the November search of his house, the December search of his van, and the December search of his house, on the ground that the WPD officers who investigated him, conducted the controlled buy, obtained and executed the search warrants, and discovered the incriminating evidence, were acting outside their jurisdiction. Green argued that searches conducted by law enforcement officers outside their jurisdiction violate the Fourth Amendment. On March 9, 1998, the district court began to hear arguments on the suppression motion. Officer Bannister testified on March 9. However, due to time constraints, the district court was unable to conclude the hearing that day. The hearing was continued on March 13, 1998, and completed on March 30.

On March 23, 1998, after the suppression hearing was substantially completed, Green and his co-defendant filed a motion to compel the government to disclose the identity of the confidential informant.

---

[4]Green and a co-defendant were also charged with conspiracy to distribute methamphetamine, but this count was dismissed when Green's co-defendant entered into a plea bargain with prosecutors on the first day of trial.

On May 1, 1998, the district court denied Green's motion to suppress on all counts. However, because "[t]he government ha[d] not responded in opposition" to the defendants' motion for disclosure of the informant's identity, the district court granted that motion. Appellant's App. Tab Q, at 16. One week later, the government filed a motion for reconsideration, asking the court to reconsider its ruling ordering the disclosure of the informant's identity, stating that it had been unaware that the district court desired a written response to the defendants' motion to disclose. At some point between May 8 and the beginning of trial on May 19, the district court denied this motion for reconsideration.

The weekend before the trial was to begin, Green and his counsel were still unaware of the informant's identity. In an effort to obtain that information, Green hired an investigator to contact, and place under subpoena, various individuals who he thought might either be the confidential informant or have some information relating to the informant. One of the individuals he placed under subpoena, Linda McReynolds, turned out to be the confidential informant, although Green was apparently unaware of this fact when he placed McReynolds under subpoena.

On May 19, 1998, the trial began. On the third day of trial, the government informed Green that, despite earlier representations to the contrary, it did not intend to call the confidential informant to the stand. Later that afternoon, the

government finally informed Green and his counsel that the confidential informant was Linda McReynolds, and Green's counsel was afforded the opportunity to interview McReynolds out of court. Green, however, opted not to call McReynolds, despite the fact that he had served her with a subpoena. In fact, Green called no witnesses of his own, and did not testify in his own defense.

On May 27, 1998, the jury found Green guilty on all three counts. After Green's various motions for a new trial were denied, none of which are at issue here, the district court held a sentencing hearing at which it sentenced Green to 135 months' imprisonment on each of the three counts, with the sentences to run concurrently. Green now appeals his convictions.

## DISCUSSION

### I.     Fourth Amendment Issues

When reviewing a district court's denial of a suppression motion, "we accept its factual findings unless clearly erroneous and view the evidence in the light most favorable to the government." United States v. Hargus, 128 F.3d 1358, 1361 (10th Cir. 1997), cert. denied, 118 S. Ct. 1526 (1998). We grant the district court's credibility determinations due deference, but "[t]he ultimate determination of reasonableness under the Fourth Amendment . . . is a question of law which we review de novo, considering the totality of the circumstances." Id.

## A.     The Searches of Green's House

Green argues that incriminating evidence from the November and December searches of his house [5] should be suppressed because the WPD officers who investigated him, obtained warrants to search his residence, and executed that warrant were acting outside their jurisdiction.  It is evident, and indeed the government does not contest, Appellee's Br. at 11, that the WPD officers were acting outside their jurisdiction in violation of Kansas law, which provides that

> (2)     Law enforcement officers employed by any city may exercise their powers as law enforcement officers:
> >     (a)     Anywhere within the city limits of the city employing them and outside of such city when on property owned or under the control of such city; and
> >     (b)     in any other place when a request for assistance has been made by law enforcement officers from that place or when in fresh pursuit of a person.

---

[5]The searches of Green's house may also be valid for another reason, not discussed below.  The record reflects that Butler County authorities, who undisputably were acting within their jurisdiction even under Kansas law, assisted the WPD officers in obtaining and executing the November Butler County search warrant, and the record also reflects that Bruce Watts, who apparently has statewide jurisdiction to conduct narcotics investigations, was present at the execution of the December federal search warrant.  In similar cases involving the application of the same Kansas statute, we have held that assistance by authorities possessing jurisdiction can serve to validate a search, even if officers acting outside their jurisdiction also participate.  See United States v. Price, 75 F.3d 1440, 1443 (10th Cir. 1996); United States v. Occhipinti, 998 F.2d 791, 798-99 (10th Cir. 1993).  However, because of the existence of some factual dispute as to the extent of the Butler County authorities' involvement, Appellant's App. Tabs S, T, and because of some uncertainty with respect to Bruce Watts' statewide authority, see id. at Tab N, we do not pursue this avenue further.

Kan. Stat. Ann. § 22-2401a(2) (West 1995);   see State v. Sodders , 872 P.2d 736, 738-40 (Kan. 1994).

"It is, however, well established in this circuit that 'in federal prosecutions the test of reasonableness in relation to the Fourth Amendment protected rights must be determined by Federal law even though the police actions are those of state police officers.'"   United States v. Le , -- F. 3d --, --, 1999 WL 176192, at *4 (10th Cir. Mar. 31, 1999) (quoting   United States v. Miller , 452 F.2d 731, 733 (10th Cir. 1971)).  This is because "'the exclusionary rule is only concerned with deterring [federal] Constitutional violations.'"   Id. (quoting United States v. Wright , 16 F.3d 1429, 1437 (6th Cir. 1994)).  Thus, "the fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended."   Id. (citation omitted).

Green argues that we have applied state law in past cases where we have considered whether a search was lawful, citing   United States v. Richardson , 86 F.3d 1537 (10th Cir. 1996);   United States v. Price , 75 F.3d 1440 (10th Cir. 1996); United States v. Occhipinti , 998 F.2d 791 (10th Cir. 1993); and   United States v. Ibarra , 955 F.2d 1405 (10th Cir. 1992).  Indeed, in   Price and Occhipinti , Kan. Stat. Ann. 22-2401a was the state statute at issue.  Green, however, misinterprets our cases.  In   Price , we explained that our discussion regarding whether the

Kansas statute was complied with in that case was secondary to the federal constitutional inquiry mandated by the Fourth Amendment. We stated that, in that case, the defendant's argument that the Kansas statute was violated failed in any event, because the officers had not acted in violation of the statute. Price, 75 F.3d at 1443; see also Richardson, 86 F.3d at 1544; Occhipinti, 998 F.2d at 798-99. However, we were careful to point out that even if the Kansas statute had been violated, that would not have ended the inquiry, because "[t]he authority in a federal case for suppressing evidence due to an unlawful search is the Fourth Amendment to the Federal Constitution. A violation of state law may or may not form the basis for suppression on Fourth Amendment grounds." Price, 75 F.3d at 1443-44 (citations omitted); cf. Ibarra, 955 F.2d at 1409-10 (conducting a Fourth Amendment inquiry even after finding that the state statute was violated).

In an effort to link the WPD officers' violation of state statutory law to the Fourth Amendment, Green cites Ross v. Neff, 905 F.2d 1349 (10th Cir. 1990). In that case, we held that "an arrest made outside of the arresting officer's jurisdiction violates the Fourth Amendment . . . ." Id. at 1353-54. That case, however, is distinguishable from the case at hand in one major respect: Ross involved a warrantless arrest outside the arresting officer's jurisdiction. Id. at 1354 (stating that "[a] warrantless arrest outside the arresting officer's jurisdiction is analogous to a warrantless arrest without probable cause" and that

-13-

"[a]bsent exigent circumstances, such an arrest is presumptively unreasonable"). A warrantless arrest is vastly different from a warranted search. In the case before us, there is no dispute that the WPD officers obtained search warrants from magistrates of the relevant jurisdiction. We decline to extend <u>Ross</u> to the context of warranted searches.

The federal constitutional standards for evaluating the validity of search warrants are well established. The Fourth Amendment requires only that the warrant contain "probable cause supported by an oath or affirmation and a particular description of the place, persons and things to be searched and seized." <u>United States v. Wicks</u>, 995 F.2d 964, 972 (10th Cir. 1993). These requirements were clearly met in this case. Green does not contest that probable cause, albeit allegedly tainted by the violation of the Kansas statute, [6] existed to support each of the three challenged searches, including the December search of the van discussed below, <u>see</u> Appellant's Br. at 19, 24, and he has not attempted to argue, either on

---

[6]Green argues that the probable cause was tainted by the violation of the Kansas statute, and therefore cannot provide a valid basis for the search warrants. In support of this proposition, Green cites <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963), and <u>United States v. Owens</u>, 782 F.2d 146 (10th Cir. 1986). While Green may be correct that probable cause obtained in violation of the <u>federal Constitution</u> may not form the basis for a valid search warrant, the cases cited by Green (or any other cases of which we are aware) do not lend support to the contention that probable cause obtained in violation of a <u>state statute</u> may never be used to support a constitutionally valid search warrant.

appeal or before the district court, that the warrants were not sufficiently particular.

In sum, there was no federal constitutional violation in this case. The Fourth Amendment is satisfied where, as here, officers obtain a warrant, grounded in probable cause and phrased with sufficient particularity, from a magistrate of the relevant jurisdiction [7] authorizing them to search a particular location, even if those officers are acting outside their jurisdiction as defined by state law.

## B.     The Stop and Search of Green's Van

Green also argues that the stop and search of his van on December 10-11, 1997, was unlawful. Green's argument is twofold. First, he argues that the "probable cause to stop and search" the van was based on information obtained by WPD officers acting outside their jurisdiction, and therefore the stop and search was unlawful under Ross v. Neff. Appellant's Br. at 13. Second, he argues that the stop and search violated the standards set forth in Terry v. Ohio, 392 U.S. 1 (1968). We address each of these arguments in turn.

---

[7]Butler County Judge Jaworsky is undisputably authorized to issue search warrants for persons or property within Butler County, and federal Magistrate Judge Humphreys is authorized, under Fed. R. Crim. P. 41(a), to issue, upon request of a government attorney, search warrants for persons or property within the entire District of Kansas.

Green's Ross argument fails here for different reasons than in the context of the warranted searches of the house. Although the officers who stopped Green's van on the evening of December 10-11, 1997, did not have an arrest warrant or a warrant to search Green's person or vehicle, the record indicates that WPD officers stopped and searched Green's car within the city limits of Wichita. When the officers stopped Green, they were within their jurisdiction. The fact that some of the uncontested probable cause for this stop was obtained by officers acting outside their jurisdiction, in violation of state law, is not necessarily a matter of constitutional significance. Le, -- F. 3d --, --, 1999 WL 176192, at *4. In the context of warrantless arrests, the Fourth Amendment requires only that the arresting officers have probable cause to believe that the person to be arrested has committed a crime, see United States v. Vazquez-Pulido, 155 F.3d 1213, 1216 (10th Cir.), cert. denied, 119 S. Ct. 437 (1998); United States v. Gama-Bastidas, 142 F.3d 1233, 1240 (10th Cir. 1998), and that the arresting officers make the arrest within their jurisdiction or under exigent circumstances, Ross v. Neff, 905 F.2d at 1353-54 & n.6. Both of these requirements were satisfied here. Because the warrantless arrest of Green was lawful, the arresting officers were entitled to

-16-

search the passenger compartment of Green's car incident to his arrest. See United States v. Lacey, 86 F.3d 956, 971 (10th Cir. 1996). [8]

Finally, we agree with the government that the standards set forth in Terry are inapplicable to this case, because the officers had probable cause to stop and arrest Green. The officers did not need to wait until Green committed a traffic violation to stop his vehicle, and the fact that they overcautiously did so need not obfuscate the analysis. This was simply not a Terry stop. The search of Green's van was lawful.

## II.    Discovery Issues

Green also takes issue with the manner in which the government turned over information relating to Linda McReynolds, the confidential informant. He asserts that the government failed to timely disclose the identity of the informant, in violation of Roviaro v. United States, 353 U.S. 53 (1957), and that the government refused to turn over unidentified impeachment information relating to the informant, in violation of Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and the district court's discovery order. In

_____

[8]Because officers had probable cause to believe that Green's van contained contraband, the search of Green's van was also lawful under the automobile exception to the warrant requirement. See United States v. Chatman, 994 F.2d 1510, 1514 (10th Cir. 1993).

addressing these arguments, we apply an abuse of discretion standard to Green's Roviaro claim, see United States v. Sinclair, 109 F.3d 1527, 1538 (10th Cir. 1997), and a de novo standard to Green's Brady and Giglio claim, see United States v. Gonzalez-Montoya, 161 F.3d 643, 649 (10th Cir. 1998), cert. denied, 119 S. Ct. 1284 (1999).

### A.    Disclosure of the Informant's Identity

On March 23, 1998, Green moved to join his co-defendant's motion for disclosure. The district court granted this motion on May 1, 1998, because the government had not filed any written response opposing the motion. The government did not immediately disclose the informant's identity, however, because it filed a motion for reconsideration which, apparently, was still pending on the eve of trial. Once it was clear that the district court was not going to grant its motion for reconsideration, the government soon disclosed the informant's identity. Thus, Green's case differs from most other cases in which this issue arises, because in this case the district court granted Green's motion for disclosure, and the government actually disclosed the informant's identity. Compare Sinclair, 109 F.3d at 1538; United States v. Leahy, 47 F.3d 396, 398 (10th Cir. 1995).

Green argues, however, that the government did not respond timely to his request for disclosure. This argument ignores the fact that the government had filed a motion for reconsideration of the district court's order, and that motion was still pending until trial. Green does not argue that this motion was filed with dilatory intent. Green contends, rather, that because he was unaware of the informant's identity until trial, his "Sixth Amendment right to confront and cross-examine the key witness against him was never provided at either the motion to suppress hearing or trial." Appellant's Br. at 28. This argument fails for multiple reasons.

First, with respect to the suppression hearing, Green overlooks the fact that he did not move for disclosure of the informant's identity until March 23, 1998, after the suppression hearing was largely completed. Indeed, Officer Bannister, the suppression hearing witness whose testimony dealt most thoroughly with the informant, had already testified on March 9, 1998. Green's argument that his rights were violated because the informant did not testify at the suppression hearing rings hollow here, given the fact that Green did not move for disclosure until two weeks after the hearing had begun, and after Bannister had testified.

In connection with this argument, Green contends that had he known the informant's identity and certain impeachment information about her, he could have "raised [a] veracity attack under Franks v. Delaware, 438 U.S. 154 (1978)[,]

necessary to suppress the evidence seized." Appellant's Br. at 36. Green

misinterprets Franks. That case allows a defendant to challenge the veracity of

statements made by a search warrant affiant, not the veracity of statements made

by a confidential informant to the affiant. See United States v. Ross, 920 F.2d

1530, 1534 (10th Cir. 1990) (stating that "the 'deliberate falsity or reckless

disregard whose impeachment is permitted . . . is only that of the affiant, not of

any nongovernmental informant'" (quoting Franks, 438 U.S. at 171)). Green does

not offer any evidence that Officer Bannister made any deliberately false

statements in either of the search warrant affidavits.[9]

In any event, the informant's presence at the suppression hearing could not

have assisted Green. Even assuming, arguendo, that Green's allegations with

regard to the informant's veracity are true, such evidence has no bearing on

whether the magistrate had probable cause to issue the warrant, so long as,

considering the totality of the circumstances set forth in the affidavit, "there is a

fair probability that contraband or evidence of a crime will be found in a

particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Indeed, the

---

[9]Green does contend that Officer Bannister testified falsely at the suppression hearing with regard to the presence of WPD's Bruce Watts at the November search of Green's residence. See Appellant's Br. at 10. However, this information was not included in the search warrant affidavits, and Green nowhere argues that any of Bannister's statements in either of the affidavits was knowingly false.

-20-

Supreme Court has stated that "the magistrate is concerned, not with whether the informant lied, but with whether the affiant is truthful in his recitation of what he was told." McCray v. Illinois, 386 U.S. 300, 307 (1967) (citation omitted). As noted above, Green has presented no evidence, either on appeal or before the district court, that the information contained in the search warrant affidavits was known to the affiant to be false. In such cases, the proper forum for the introduction of evidence that the informant was untruthful is trial, not a suppression hearing.

Second, Green's argument that his rights were violated because the informant did not testify at trial is similarly flawed. The informant did not testify at trial because Green did not call her to testify, despite the fact that she was under subpoena. By the time the prosecution rested, Green was fully aware of the informant's identity, and had even had the opportunity to interview her outside of court. Presumably, Green's decision not to call the informant to the stand was a tactical decision made by Green and his counsel. Neither the government nor the district court precluded Green from questioning the informant at trial.

Nevertheless, Green argues that he was prejudiced at trial by the admission of allegedly improper "hearsay" testimony of Officer Bannister. Green, however, did not object to the introduction of these statements. Green's explanation for his failure to object is that the government had stated that it would call McReynolds

to the stand, and Green assumed that he would have a chance to cross-examine McReynolds with respect to the statements made by Bannister. Even if we assume that these statements were in fact inadmissible hearsay, a proposition that is by no means obvious, we would review their admission for plain error, because Green failed to object. See United States v. Pacheco, 154 F.3d 1236, 1240 (10th Cir. 1998), cert. denied, 119 S. Ct. 886 (1999). There was no plain error here. "Plain error is that which is obvious, or which seriously affects the fairness or integrity of the trial." Id. In light of the fact that Green had McReynolds under subpoena, yet elected not to call her to question her regarding the statements made by Officer Bannister, we cannot conclude that the integrity or fairness of the trial was affected by the admission of Bannister's statements.

### B. Disclosure of Impeachment Information

Finally, Green contends that the government failed to comply with the district court's discovery order and with Brady and Giglio by refusing to turn over unidentified information that allegedly could have been used to impeach McReynolds. Green, however, does not identify any particular exculpatory evidence that the government failed to disclose. Thus, Brady is not directly implicated by Green's argument. And, because both the discovery order and Giglio apply only to impeachment information relating to a government witness,

-22-

see Giglio , 405 U.S. at 153-55; Appellant's App. Tab B, at 3-4, they are inapplicable because the government did not ever call McReynolds as a witness. Thus, Green's arguments must fail.

## CONCLUSION

Accordingly, for the reasons discussed herein, we AFFIRM Green's convictions.