UNITED STATES, Plaintiff,

v.

Juan Ramon PRIETO–ZUBIA, Jamie Alonso Lujan–Ramirez, Defendants.

Nos. CRIM.A00–20055–01KHV, CRIM.A00–20055–02KHV.

United States District Court, D. Kansas.

June 27, 2000.

Brent I. Anderson, Office of United States Attorney, Kansas City, KS, for U.S.

Charles D. Dedmon, Office of Federal Public, William F. Dunn, Richard L. Carney, Kansas City, KS, for defendants.

### MEMORANDUM AND ORDER

VRATIL, District Judge.

This matter comes before the Court on the *Motion To Suppress* (Doc. # 41) by Juan Prieto–Zubia and the *Motion To Suppress* (Doc. # 43) by Jamie Lujan–Ramirez, both filed May 24, 2000. For the reasons stated below, the Court denies defendants' motions.

#### Facts

On the morning of April 17, 2000, Ray Bailiff, an officer with the Kansas Highway Patrol and member of the Drug Enforcement Agency (DEA) task force, received a phone call from a confidential informant at the Best Western Inn at 501 Southwest Boulevard, Kansas City, Kansas. In his work with the DEA, Bailiff works in hotel-motel interdiction and has formed contacts with hotel personnel who inform him of possible drug-related activities. Bailiff had asked one of his contacts to tell him if someone checked into the hotel and gave an address of Midland or Odessa, Texas. Midland/Odessa is a known drug traffick-

ing area and is part of the source pipeline for transporting drugs to Kansas City. The informant told Bailiff that a group of people had checked into the Best Western at approximately 8:10 a.m. and paid cash for the room. A woman named Cindy Magana gave her name for the room and listed her address as Midland/Odessa, Texas. The group was driving a gold Dodge Stratus.

Bailiff contacted Tim McCue, a DEA agent who also works in hotel-motel interdiction. McCue ran the available information through the DEA Narcotics And Dangerous Drug Information System (NADDIS). The NADDIS, which contains information from approximately the last 25 years, is a database of information regarding people, places and things which DEA agents have come across in various drug investigations. Any DEA agent can put information into the NADDIS, and information from an investigation can be entered regardless whether the government has arrested or convicted anyone based on the investigation. The NADDIS entries includes a "remarks" section which generally describes why a particular person or item was entered into the database.

McCue ran Cindy Magana's name through the NADDIS. He discovered one reference to a Cindy Magana from California, who was entered into the NADDIS within the last three years as a possible drug courier. The Cindy Magana listed in the NADDIS had approximately the same date of birth as the woman who had checked into the Best Western.

McCue also ran the license tag to check the registration of the gold Stratus. The car was registered to Mark Cardwell, with a listed address of 7855 Alameda, El Paso, Texas. Like Midland/Odessa, El Paso is a key part of the supply chain of drugs to Kansas City. Based on his experience, Bailiff knew that the address was a car dealership in El Paso. McCue ran the address through the NADDIS and found nine entries regarding 7855 Alameda. El Paso is approximately 300 miles from the Midland/Odessa area. Bailiff testified that

drug couriers often use recently-registered vehicles or vehicles which are not registered in their own names.

Bailiff testified that the DEA began surveillance on the Best Western based on the information which was present, including (1) the early check-in, indicating late-night travel which is common to drug trafficking; (2) payment for the room in cash, another common characteristic of drug trafficking; (3) the discrepancy between Cindy Magana's listed address and the registered address for the Stratus; and (4) the NADDIS hits for Cindy Magana and 7855 Alameda.

While Bailiff watched the Best Western, he saw Mark Cardwell and Cardwell's three-year old daughter get in the Stratus and drive to the Sonic Drive–In located next to the hotel. The pair ordered lunch. Bailiff testified that this conduct was another indicator of drug trafficking, because drug traffickers do not venture about the city; they stay close to their hotel rooms.

Cardwell drove the Stratus back to the hotel. A short time later, he and his daughter again got in the Stratus and drove one mile east on Southwest Boulevard to the Taqueria Mexico Restaurant. Officers knew that the Taqueria Mexico Restaurant was connected with a prior drug investigation. Officers observed Prieto–Zubia and Ramirez standing outside the restaurant, apparently waiting on someone. Cardwell parked across the street from the restaurant, and Prieto–Zubia and Ramirez crossed the street and approached him. The parties immediately exchanged what appeared to be keys. They did not greet each other, shake hands, or engage in any conversation. Prieto–Zubia and Ramirez got into the Stratus, while Cardwell and his daughter got into a green Oldsmobile Achieva. Officers discovered that the Achieva was registered to Delicia Galvan of Kansas City, Kansas and that her address was connected to another drug investigation in Kansas City.

Prieto–Zubia drove the Stratus west on Southwest Boulevard, with Ramirez in the

passenger seat. McCue, Tom Catania, and Norma Lorenzo—all members of the DEA task force—followed defendants. McCue and Catania immediately followed defendants, while Lorenzo later caught up with the group. While driving west in the left lane on Kansas Avenue, Prieto–Zubia cut quickly across the right lane and made a right turn on 10th Street. Catania was closest to defendants in an unmarked police car and placed an emergency light on his dashboard, attempting to stop defendants. Catania also honked his horn to attract defendants' attention. Defendants did not appear to notice Catania and continued driving for approximately a mile and a half. Defendants did not drive evasively or otherwise attempt to elude Catania. Defendants turned west on Ray Avenue, then south on Bethany, a dead end street. Defendants parked the Stratus in front of 355 Bethany.

Defendants opened the doors of the Stratus and began to exit the vehicle. Catania and McCue drew their weapons and ordered defendants to stop. Defendants began walking towards the residence. Lorenzo made the same orders to stop in Spanish, and defendants complied.[1] Catania approached Ramirez while McCue approached Prieto–Zubia. The officers placed defendants on the ground and handcuffed defendants' hands behind their backs. Catania and McCue testified that the officers were afraid for their safety because (1) they believed defendants were involved in a drug transaction, which commonly includes weapons, (2) defendants failed to stop, giving them time to retrieve weapons from the car, and (3) defendants made several turns before stopping and pulled into a dead end street in front of a residence. After handcuffing defendants and patting them down for weapons, the officers picked them up off the ground. Lorenzo told defendants that they were not under arrest.

Catania then made a "cursory" sweep of the Stratus interior, looking for weapons. Catania observed what he termed "tool marks" in the seam of the passenger side air bag, where it looked as if someone had pried the air bag compartment open. Catania testified that tool marks often indicate the location of hidden drugs, and he therefore believed that the air bag compartment contained drugs.

At the same time, McCue was speaking with Prieto–Zubia, while Lorenzo served as an interpreter for the two. Prieto–Zubia originally stated that he did not know who owned the Stratus. He further stated that a friend lived at the residence where defendants had stopped. He then stated that his cousin lived there, but he could not provide the cousin's name. Lorenzo asked Prieto–Zubia whether he minded if officers searched the Stratus. Prieto–Zubia stated that he did not mind.

Catania then searched the car. He pulled back the cover to the passenger air bag. Instead of an air bag, Catania saw the components to a locking device. He then pried the cover off and discovered 6–8 inches of felt which covered open space where the air bag should have been. Catania also observed that the air hosing was not connected. Catania removed the felt and discovered five bags wrapped in tape. Catania told McCue, who removed the bags from the compartment. Based on their experience, the officers believed that the bags contained cocaine. McCue field-tested the bags' contents and confirmed that the bags contained cocaine. The officers placed defendants under arrest and Lorenzo provided defendants their *Miranda* rights in Spanish.

Prieto–Zubia asks the Court to suppress evidence seized from the vehicle. Lujan–Ramirez asks the Court to suppress all evidence obtained as a result of this search as well as all statements and observations by law enforcement officers concerning the incident.

### Analysis

#### 1. Vehicle Stop

■ Defendants argue that the government unlawfully detained them for a

---

1. Officer Lorenzo was born in Puerto Rico and Spanish is her native language.

traffic violation. The government argues that officers did not stop defendants for a traffic violation, but because they had probable cause to believe that defendants were trafficking drugs. "Probable cause to arrest exists when an officer has learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested." *United States v. Anchondo,* 156 F.3d 1043, 1045 (10th Cir.1998). Here, the officers had probable cause to believe that defendants were transporting drugs in the Stratus. This suspicion was based on (1) the early check-in, indicating late-night travel; (2) payment for the room in cash; (3) Cindy Magana's Midland/Odessa address as part of the source route for drugs to Kansas City; (4) the El Paso address for the Stratus registration, part of the source route for drugs to Kansas City; (5) the discrepancy between Cindy Magana's listed address and the registered address for the Stratus; (6) the NADDIS hits for Cindy Magana and 7855 Alameda; (7) Cardwell's short trip to a restaurant next door, indicating a desire to remain close to the Best Western; (8) the rendezvous at the Taqueria Mexico restaurant, which was connected to a prior drug investigation; (9) the rapid exchange of car keys with no conversation or greeting; and (10) the fact that defendants gave Cardwell the keys to a vehicle registered to an address connected to drug activity in another investigation. The stop of defendants was justified because based on all of the facts, a reasonable person would believe that defendants were transporting drugs in the Stratus. In particular, the evidence shows that Cardwell and his wife drove the Stratus from parts of Texas commonly connected with drug activity. Shortly after arriving in Kansas City, Cardwell gave the Stratus to defendants with no conversation or any apparent greeting. Such conduct is not consistent with typical innocent conduct.

Officer Bailiff testified that when he saw the rapid exchange of keys, he was fully convinced that he was witnessing a drug deal. The Court agrees and finds that the officers had probable cause to stop defendants.

Defendants contend that because the officers waited for a traffic violation before attempting to stop defendants, the officers must have lacked probable cause or even a reasonable suspicion of drug trafficking. The Court disagrees. "The officers did not need to wait until [defendants] committed a traffic violation to stop [the] vehicle, and the fact that they over cautiously did so need not obfuscate the analysis." *United States v. Green,* 178 F.3d 1099, 1107 (10th Cir.1999). Regardless why the officers did not immediately stop defendants when they left the restaurant, the evidence establishes probable cause to believe defendants were trafficking drugs.

### 2. Search of the Stratus

The Court likewise finds that the officers had probable cause to believe that the Stratus contained drugs, based on the same facts listed above. The officers therefore rightfully searched the Stratus under the so-called "automobile exception." The Supreme Court recently stated:

The Fourth Amendment generally requires police to secure a warrant before conducting a search. *California v. Carney,* 471 U.S. 386, 390–391, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985). As we recognized nearly 75 years ago in *Carroll v. United States,* 267 U.S. 132, 153, 45 S.Ct. 280, 69 L.Ed. 543 (1925), there is an exception to this requirement for searches of vehicles. And under our established precedent, the "automobile exception" has no separate exigency requirement. We made this clear in *United States v. Ross,* 456 U.S. 798, 809, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), when we said that in cases where there was probable cause to search a vehicle "a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained." In a case with

virtually identical facts to this one ..., *Pennsylvania v. Labron*, 518 U.S. 938, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996) (per curiam), we repeated that the automobile exception does not have a separate exigency requirement: "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment ... permits police to search the vehicle without more." *Id.*, at 940, 518 U.S. 938, 116 S.Ct. 2485, 135 L.Ed.2d 1031.

*Maryland v. Dyson*, 527 U.S. 465, 466–67, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999). Because the officers had probable cause to believe that the Stratus contained drugs, the search of the Stratus was proper. *See Green*, 178 F.3d at 1107 n. 8; *United States v. Anderson*, 114 F.3d 1059, 1066 (10th Cir.1997).

■ Further, the officers also had the right to search the Stratus incident to defendants' arrest. The Tenth Circuit has stated that:

> police may conduct a contemporaneous warrantless search of a vehicle's passenger compartment incident to a lawful arrest. The [Supreme] Court deliberately created a bright line rule because "[a] single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront."

*United States v. Lugo*, 170 F.3d 996, 1003 (10th Cir.1999) (citations omitted). Even though defendants were restrained before the search, the search was not so remote to make the search invalid. *See United States v. Humphrey*, 208 F.3d 1190, 1201 (10th Cir.2000). Further, the fact that the officers told defendants that they were not under arrest until after Catania discovered the drugs does not prevent a valid search incident to arrest. A warrantless search incident to arrest is valid so long as (1) there existed a legitimate basis for the arrest before the search; and (2) the arrest took place shortly after the search. *Lugo*, 170 F.3d at 1003. Even assuming

that defendants were not under arrest until after Catania discovered the drugs, the officers had a legitimate basis for the arrest even before the search.

Finally, while one could argue that the air bag compartment is not easily accessible by occupants of the vehicle and therefore not covered by the rationale behind a search incident to arrest, this issue is unimportant here. While conducting a proper search incident to arrest, Catania made a plain view observation of tool marks in the air bag seam, indicating that it had been tampered with. *See United States v. Ortiz*, 63 F.3d 952, 953 (10th Cir.1995) (upholding plain view search). Given the previous evidence of drug trafficking, Catania had probable cause to believe that the air bag compartment contained drugs. *See Anderson*, 114 F.3d at 1065 (observation that someone had tampered with gas tank).

**IT IS THEREFORE ORDERED** that the *Motion To Suppress* (Doc. # 41) by Juan Prieto–Zubia and the *Motion To Suppress* (Doc. # 43) by Jamie Lujan–Ramirez filed May 24, 2000 be and hereby are **DENIED**.