PUBLISH

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 31 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JOSEPH RUSSELL MIKULSKI,

Defendant - Appellant.

No. 01-4169

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 2:00-CR-227-S)**

---

Benjamin A. Hamilton, Salt Lake City, Utah, for the Defendant-Appellant.

Wayne T. Dance, Assistant United States Attorney (Paul M. Warner, United States Attorney, with him on the brief), Salt Lake City, Utah, for the Plaintiff-Appellee.

---

Before **KELLY** , **BALDOCK** , and **HENRY** , Circuit Judges.

---

**HENRY** , Circuit Judge.

---

Joseph Russell Mikulski was charged in a one-count indictment with possession of stolen mail in violation of 18 U.S.C. § 1708. After the district court denied Mr. Mikulski's motion to suppress, Mr. Mikulski entered a conditional plea of guilty to the charge. Mr. Mikulski received a sentence of sixty months of imprisonment. He now appeals the district court's denial of his motion to suppress. He argues that the evidence should be suppressed because (1) the officers exceeded their jurisdictional authority when they arrested him; (2) the officers lacked reasonable suspicion to detain him; and (3) the subsequent detention was also unlawful. We hold that the officers' actions were permissible under Utah Code Ann. § 77-9-3, which allows an officer to exercise authority outside of his established jurisdiction when a public offense is committed in an officer's presence. We also hold that the initial questioning and the subsequent detention of Mr. Mikulski were permissible. For the reasons stated below, we affirm the decision of the district court.

## I. BACKGROUND

The background facts are not in dispute, and we reiterate them as found by the district court. On February 9, 2000, Detective Wally Perschon was assisting other deputies from Utah County, Utah in trying to recover stolen property. The property had been stolen in Utah County, but information from an informant

suggested that the property was (1) located in the West Valley-Kearns area of Salt Lake County at a house located at 4560 West 5780 South, and (2) in the possession of a man named Johnnie Green. Detective Perschon did not have a physical description of Mr. Green, other than that he was a white male who drove a truck.

Detective Perschon, accompanied by three other members of the Utah County Sheriff's office, Detectives Richard Case, Darrin Durfey, and Sergeant Jerry Monson, traveled to Salt Lake County to locate the property and to talk to Mr. Green. No other officers from either Salt Lake County or the West Valley City Police Department were contacted or present at any time during the Utah County officers' visit to Salt Lake County until after Mr. Mikulski's arrest.

Upon reaching the address at approximately 9:00 pm, Sergeant Monson and Detective Case knocked on the door of the house at 4650 West 5780 South. The occupants informed them that Mr. Green had just left, and the officers waited inside the house. In order to avoid detection, Detectives Perschon and Durfey waited for Mr. Green approximately one block down the street from the residence in an unmarked green vehicle.

After about fifteen minutes, a man and a woman exited the house to smoke cigarettes on the porch. During this time, a pickup truck approached the house and pulled to the side of the street opposite to oncoming traffic, right before the

house's driveway. An individual exited the passenger's side and approached the house. According to testimony from Detective Perschon, the individuals on the porch appeared to wave the passenger off, and the individual returned to the truck.

Detective Perschon, with Detective Durfey, suspecting that Johnny Green was in the truck, drove up to the truck. Detective Perschon did not use emergency lights and he did not block the truck. The detectives, dressed in plainclothes, approached the truck, one on each side of the pickup. While approaching the vehicle, Detective Perschon noticed the truck lacked a front license plate. The detectives identified themselves and showed the truck's occupants, a male driver and a female passenger, their badges. Detective Perschon testified that he was uncertain at what point in time Detective Durfey and Sergeant Monson joined him around the truck. Detective Perschon testified that as he approached the vehicle, Mr. Mikulski appeared "very nervous" but "[n]ot aggressive." Rec. vol. II, at 47 (Motion to Suppress Hr'g, dated Aug. 4, 2000). Detective Perschon asked the driver who he was, and the driver identified himself as Joseph, but stated that he had no identification.

Detective Perschon asked again for identification, and the driver again stated that he had none. At this point, Detective Perschon suspected that the driver was hiding his identity. Detective Perschon testified that other than the

-4-

missing front plate and a potential parking violation, he had no reason to believe that Mr. Mikulski had committed a crime.

Detective Perschon testified that he then asked the driver to step out of the truck to search him for identification and to check for weapons. Detective Perschon admitted that although he had no reason to believe that the driver was armed, his standard practice was to conduct a frisk in the interest of officer safety. Detective Perschon also testified that Mr. Mikulski's nervous demeanor made the detective concerned for his own safety.

Before conducting a pat-down search, Detective Perschon asked the driver if he had any weapons on his person. The driver responded that he had a knife on his belt. Detective Perschon told Mr. Mikulski to put his hands on the vehicle where the detective could see them. Detective Perschon performed a pat-down search, which also revealed a pistol in the driver's left front pocket. Detective Perschon placed the driver under arrest for carrying a concealed firearm.

Detective Perschon told the driver not to move, and requested assistance in securing the weapon. After handcuffing Mr. Mikulski, Detective Perschon conducted a further pat-down search that revealed drugs in the driver's left shirt pocket. Detective Perschon also found a wallet on the driver with several pieces of identification, with various names. Mr. Mikulski identified himself as Joseph Mikulski. Detective Perschon directed another officer to run a records check,

because of the conflicting identifications. Mr. Mikulski was eventually turned over to Salt Lake County authorities. The Salt Lake County Sheriff's Office agreed to transport Mr. Mikulski to jail and to impound the vehicle.

After contacting the Salt Lake County authorities, Detective Perschon testified that he conducted a vehicle inventory, because "[the Salt Lake County authorities] didn't want to." Rec. vol. II, at 61. The inventory revealed a backpack containing multiple and conflicting pieces of identification, and equipment to make false identifications, credit card statements, and bills that were not in Mr. Mikulski's name, other people's property, cameras, telephones, and more drugs. The stolen mail formed the predicate for the indictment for violation of 18 U.S.C. § 1708.

## II. DISCUSSION

In reviewing the district court's denial of Mr. Mikulski's motion to suppress, we view the evidence in the light most favorable to the district court's determination and accept the factual findings of the district court unless they are clearly erroneous. *United States v. Wood*, 106 F.3d 942, 945 (10th Cir. 1997). Our ultimate determination of reasonableness under the Fourth Amendment is a question of law that we review de novo. *See id.*

Mr. Mikulski, in challenging the district court's denial of his motion to suppress, argues that (1) the officers exceeded their authority by exercising power

beyond the limits of their jurisdiction in violation of Utah Code Ann. § 77-9-3;

(2) the initial encounter was not consensual; and (3) the subsequent detention and

pat-down search were also unlawful. First, we consider Mr. Mikulski's charge

that the officers acted unlawfully in exceeding their jurisdiction. We then turn to

the balance of Mr. Mikulski's arguments.

## A.    Extra-jurisdictional activities

Mr. Mikulski contends that when the Utah County officers decided to

venture into Salt Lake County to locate Johnnie Green, that they were required to

notify Salt Lake County authorities, pursuant to Utah Code Ann. § 77-9-3, which

adopts the Uniform Act on Fresh Pursuit. The statute provides that:

> (1) Any peace officer authorized by any governmental entity of this state may exercise a peace officer's authority beyond the limits of such officer's normal jurisdiction as follows:
> (a) when in fresh pursuit of an offender for the purpose of arresting and holding that person in custody or returning the suspect to the jurisdiction where the offense was committed;
> (b) **when a public offense is committed in such officer's presence;**
> (c) **when participating in an investigation of criminal activity which originated in the officer's normal jurisdiction in cooperation with the local authority;**    or
> (d) when called to assist peace officers of another jurisdiction.
> (2) (a) **Any peace officer, prior to taking any action authorized by Subsection (1), shall notify and receive approval of the local law enforcement authority, or if the prior contact is not reasonably possible, notify the local law enforcement authority as soon as reasonably possible.**
> (b) Unless specifically requested to aid a peace officer of another jurisdiction or otherwise as provided for by law, no legal responsibility for a peace officer's action outside his normal jurisdiction, except as

-7-

provided in this section, shall attach to the local law enforcement authority.

Utah. Code Ann. § 77-9-3 (emphasis added).

The government cites little helpful authority to directly support its contention that upon discovery of the partially loaded firearm, in the interest of officer safety, exigent circumstances existed to justify the warrantless arrest. Rather, the government curiously cites *Ross v. Neff*, 905 F.2d 1349 (10th Cir. 1990), where we noted that an arrest made in hot pursuit would likely be constitutionally valid. [1] *See id.* at 1354, n.6. The government also concedes that before the district court, it admitted that "the officers did not comply with Utah State law in coordinating their investigation with local law enforcement in Salt Lake County." Aple's Br. at 22, n.8 [2]

Here, the magistrate judge and the district court did not conclude that exigent circumstances existed, but, rather, determined that the officers' violation

---

[1] No allegation of hot pursuit exists here. *Ross* was a § 1983 action arising from the plaintiff's arrest by an Oklahoma state police officer of the Cherokee Indian defendant on Indian Tribal Trust land. We held that the extra-jurisdictional arrest was invalid and stated that "[a]bsent exigent circumstances, [an arrest executed outside of the arresting officer's jurisdiction] is presumptively unreasonable," and "violates the Fourth Amendment." *Ross*, 905 F.2d at 1353-54.

[2] Despite this concession, the government declined to "address whether the arrest occurred outside of the officers' territorial jurisdiction." Aple's Br. at 22. The government's omission of discussion of this obviously relevant issue is not helpful to this court.

of state law did not rise to the level of a federal constitutional violation.  In so finding, the district court relied upon *United States v. Green*, 178 F.3d 1099, 1106 (10th Cir. 1999), where we upheld a warranted search conducted by officers "outside their jurisdiction as defined by state law."

In *Green,* we noted that the "exclusionary rule is only concerned with deterred [federal] Constitutional violations," *id.* (internal quotation marks and citations omitted), and that "the fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended." *Id.* However, we also noted in *Green* that *Ross* was easily distinguishable because *Ross* "involved a *warrantless* arrest outside the arresting officer's jurisdiction," *Green*, 178 F.3d at 1106 (emphasis in original), and that *Green* involved a warranted search.  We noted that "[a] warrantless arrest is vastly different from a warranted search," and reiterated *Ross's* holding that a warrantless arrest outside the arresting officer's jurisdiction is presumptively invalid. *See id.* ("[W]e decline to extend *Ross* to the context of warranted searches.").

The officers' violation of state law is not, without more, necessarily a federal constitutional violation. *See United States v. Baker,* 16 F.3d 854, 856 n.1 (8th Cir. 1994) ("A police violation of state law does not establish a Fourth Amendment violation.  However, the question of compliance with state law may

well be relevant in determining whether police conduct was reasonable for Fourth Amendment purposes."). We thus must determine whether the officers' actions amounted to a federal violation.

The Seventh Circuit recently distinguished *Ross* in an instructive opinion, *Pasiewicz v. Lake County Forest Preserve Dist.*, 270 F.3d 520, 527 n.3 (7th Cir. 2001). In *Pasiewicz*, the plaintiff, after his acquittal on a public indecency charge, filed a § 1983 action alleging, in part, that the arresting officers acted without jurisdiction and without a warrant. The plaintiff had been arrested within the jurisdiction of the Illinois State forest preserve police forces. *See id.* By statute, a state officer's extraterritorial jurisdiction must be directed by the forest preserve's chief of police or other head. *See id.* at 526.

The Seventh Circuit noted that unlike in *Ross*, *Pasiewicz* did not implicate a state officer's ability "to arrest a Native American on tribal trust land." *Id.* at 526 n.3 (citing *Ross*, 905 F.2d at 1352). Rather, *Pasiewicz* "concern[ed] the jurisdiction of officers acting between *political subdivisions of the same state*." *Id.* (emphasis added); *compare with Ross*, 905 F.2d at 1354 (holding that "[t]he 'borrowing' provision of [the Assimilative Crimes Act] . . . does not grant states independent authority to enforce their own laws over Indians on Indian land") *and with United States v. Baker*, 894 F.2d 1144, 1147 (10th Cir. 1990) (suppressing evidence because county district court exceeded its jurisdiction when it issued a

search warrant for property on a tribal reservation because the state had no jurisdiction over the reservation to enforce state law, including to execute a search warrant, unless Congress consented to the state's jurisdiction).

Here, the situation is analogous to that in *Pasiewicz*. Utah law authorizes the assumption of criminal jurisdiction by any peace officer authorized by "any [Utah] governmental entity." § 77-9-3. We remain troubled for several reasons, however. First, there is no allegation of fresh pursuit. Second, the Utah County detectives had ample time to coordinate a four-person investigation in Salt Lake County, but apparently never considered § 77-9-3(2)(a)'s requirement that they "notify and receive approval of the local law enforcement authority" before setting off to conduct surveillance at the residence located at 4560 West 5780 South. Furthermore, it seems clear that the officers knew they were outside their jurisdiction, because they contacted the Salt Lake authorities after the arrest. "Such a blatant disregard of state law and the chain of command . . . weigh[s] on the scales of reasonableness." *Pasiewicz*, 270 F.3d at 527 (noting that the officers did not "kn[ow] they lacked jurisdiction").

The government tries to emphasize that exigent circumstances, analogous to the immediacy of "fresh pursuit," existed here. This argument is difficult to accept. The government concedes that the Utah county officers ignored the state statute, but it refuses to acknowledge that any exigency may have responsibly

been avoided through adherence to the statute, via notification of the Salt Lake County authorities.  Although it might not be reasonable to expect an officer to anticipate the events that ensue during a traffic stop, the Utah County officers here had complete control of the parameters of the investigation, when and where it occurred, and who was involved.  It *is* reasonable to expect the assurance that officers will comply with the relevant laws so as to avoid the manufacture of "exigencies."  *See United States v. Morgan,* 743 F.2d 1158, 1163 (6th Cir. 1984) (noting that in the context of a warrantless arrest, "[p]olice officials . . . are not free to create exigent circumstances to justify their warrantless intrusions.").

Despite the apparent violation of state law, we cannot say that the officers' actions amounted to a federal violation.  Detective Perschon, upon noticing that the pickup truck lacked a front license plate, had probable cause to believe that a public offense had been committed.  *See State v. Trane*, No. 20010068, 2002 WL 31055998, at *8, 57 P.3d 1052 (Utah Sept. 17, 2002) (holding officer authorized to make arrest for misdemeanor and noting that "[t]he term 'public offense' under section 77-7-2(1) generally includes misdemeanors").  [3]  Detective Perschon soon

---

[3]  Section 77-7-2 states:
A peace officer may make an arrest under authority of a warrant or may, without warrant, arrest a person:
(1) for any public offense committed or attempted in the presence of any peace officer . . . .
Utah Code Ann. § 77-7-2(1).

learned that Mr. Mikulski was armed.  Under the totality of the circumstances, any contact with the local law enforcement authority at this time was not "reasonably possible."  Utah Code Ann. § 77-9-3(2)(a).  We hold, that under the facts before us, he was then authorized to arrest Mr. Mikulski.  Furthermore. the record indicates that the officers contacted the Salt Lake County officials soon after Mr. Mikulski's arrest.

We, like the Utah Supreme Court, do not condone the officers' violation of the law or their failure to comply with proper law enforcement procedures, particularly in an area where several municipalities must work together in order to protect the rights of citizens and achieve the purposes of cooperative and effective law enforcement.  *See State v. Fixel*, 744 P.2d 1366, 1369 (Utah 1987). [4]

## B.      Legality of the Initial Encounter

Mr. Mikulski contends that the detectives lacked the requisite reasonable suspicion when they approached Mr. Mikulski and questioned him.  The district

---

[4] Separately, we note that Utah has evaluated a violation of § 77-9-3 and determined that the "legislature has not seen fit to enact any statutory remedy" for such misconduct.  *Fixel*, 744 P.2d at 1369.  "It is only where the violation also implicates fundamental, constitutional concerns, is conducted in bad-faith or has substantially prejudiced the defendant that exclusion *may* be an appropriate remedy."  *Id.* (internal quotation marks omitted) (emphasis in original).  Here, in contrast, we have determined that the violation does not implicate constitutional deprivation of rights, there has been no allegation of bad faith, and there has been no suggestion of prejudice.

court, however, determined that the initial interaction between Detective Perschon and Mr. Mikulski was a consensual encounter. We agree. The officers did not make a sufficient showing of authority to sufficiently convey to Mr. Mikulski that his liberty was restrained. The detectives, dressed in plainclothes, walked up to the truck that was stopped. The detectives' vehicle did not block the Mr. Mikulski's path or exit. While the detectives displayed their badges to identify themselves, they did not display a weapon or use any coercive language or tone. The questioning took place in a public setting in full view of two people on the porch of 4560 West 5780 South and in front of the truck's passenger. Although "[Mr.] Mikulski was never informed by Detective Perschon that he need not answer the detective's questions," Rec. vol. I, doc. 49, at 16 (Magistrate Judge's Report and Recommendation, filed Feb. 15, 2001), Detective Perschon gave Mr. Mikulski "no reason to believe that [he was] required to answer the [detective's] questions." *United States v. Drayton*, 122 S. Ct. 2105, 2112 (2002). Finally, the record does not indicate that the officers behaved in a manner that was threatening. We agree with the district court that the initial encounter was consensual. *See United States v. Lambert,* 46 F.3d 1064, 1067 (10th Cir. 1995) (holding that a police officer's encounter with the defendant had been consensual, and stating that "a seizure does not occur simply because a police officer

-14-

approaches an individual and asks a few questions") (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)).

## C.    Continued Detention of Mr. Mikulski

Mr. Mikulski next contends that the district court erred when it determined that Detective Perschon's continued questioning and subsequent pat-down search of Mr. Mikulski were supported by reasonable suspicion.  After reviewing the record in the light most favorable to the government, considering the totality of the circumstances, and deferring to the district court's assessment of the credibility of the witnesses, we conclude that the district court's factual findings are not clearly erroneous.  *See, e.g., United States v. Long*, 176 F.3d 1304, 1307 (10th Cir. 1999).  Upon de novo review of the legal question presented, *see United States v. Caro*, 248 F.3d 1240, 1243 (10th Cir. 2001), we agree with the district court's ultimate determination of reasonableness.

As noted above, Detective Perschon had already noted the lack of a front license plate on the pickup truck when he approached Mr. Mikulski.  In addition, Mr. Mikulski seemed nervous and was unable to confirm his identity.  Detective Perschon testified that, in his experience, such reticence often results from a driver whose license has been suspended or who may have an outstanding warrant.  Based on the totality of the circumstances, Detective Perschon was justified in asking Mr. Mikulski to step out of the truck.  In addition, we agree

with the district court that Detective Perschon's inquiry about the presence of weapons and subsequent protective frisk were reasonable. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968) (officer may pat-down suspect for weapons when he suspects criminal activity and he has a reasonable fear for his own or others safety). Mr. Mikulski told Detective Perschon he had a knife in his belt. The frisk was justified. *Cf. Terry*, 392 U.S. at 27 ("The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.") (citations omitted).

Under the totality of these circumstances, we agree with the district court that there was a particularized and objective basis for suspecting Mr. Mikulski of criminal activity and that Detective Perschon's actions during the detention were reasonably related in scope to the circumstances that justified the extended detention. As a result, Mr. Mikulski's detention did not violate the Fourth Amendment.

### III. CONCLUSION

For the reasons stated above, we AFFIRM the district court's denial of Mr. Mikulski's motion to suppress.