**UNITED STATES of America,
Plaintiff,**

v.

**Joseph R. MIKULSKI, Defendant.**

**No. 2:00–CR–0227–S.**

United States District Court,
D. Utah,
Central Division.

April 6, 2001.

Paul M. Warner, U.S. Attorney, Leshia M. Lee–Dixon, Asst. U.S. Atty., Salt Lake City, UT, for plaintiff.

Benjamin A. Hamilton, Salt Lake City, UT, for defendant.

**1206**

## ORDER

SAM, Senior District Judge.

This matter is before the court on defendant's motion to suppress the evidence obtained from a warrantless search of his vehicle. Pursuant to 28 U.S.C. § 636(b)(1)(B), the case, including the motion to suppress, was referred to the magistrate judge who conducted evidentiary hearings and requested briefing on the motion to suppress. On February 15, 2001, the magistrate judge issued a Report and Recommendation ("R & R") that the motion to suppress be denied. Defendant filed objections to the R & R and the government filed a response to the defendant's objections. Accordingly, the court conducted a *de novo* review of all evidence and information relating to the motion and finds as follows:

There seems to be little or no dispute over the facts at issue. While there is some disagreement as to when Detective Perschon may have noticed that the vehicle in question contained no front license plate, there is sufficient evidence that he did notice the missing plate and his testimony is credible on that issue.

▮ The defendant's main objections seem to involve application of the law to the relatively undisputed facts. Accepting the facts as found by the magistrate judge, the court is of the view that the initial encounter was consensual. Pulling alongside the vehicle in plain clothes and questioning the occupants in the manner suggested by the evidence amounts to a consensual encounter given that any reasonable person under the totality of the circumstances at issue would have felt that he was free to decline the officer's request or otherwise terminate the encounter. The court therefore adopts the findings and analysis of the R & R on this issue.

▮ The magistrate then found that the initial questioning of defendant and his

passenger gave rise to reasonable suspicion that something criminal may be afoot. The court agrees. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) establishes that police officers are entitled to consider the totality of the circumstances, or a "series of acts, each of them perhaps innocent in itself," to determine if further investigation or questioning is warranted. *Id.* at 22, 88 S.Ct. 1868. Quoting from the R & R,

Here the totality of the circumstances provided sufficient justification for the officers to ask defendant out of the truck to question him concerning his identity. They were entitled to determine who he was since he was only providing his first name of Joseph. Perschon testified that based on his training and experience, he knew that oftentimes individuals who want to hide their identity, tell officers that they have none on their person, and do so to try and hide the fact that they may have warrants or suspended licenses. Perschon stated that he asked defendant out of the truck when defendant equivocated in giving basic identification information and because of the lack of a front license plate on the pickup truck. At this point, the court finds that Detective Perschon had a reasonable suspicion that some illegal activity was going on. Asking defendant out of the pickup truck is a minimal intrusion, allowing Perschon to investigate the matter further. It is important to note that *"Terry* has come to stand for two distinct propositions—an investigative detention ('stop') in which a police officer, for the purposes of investigation, may briefly detain a person on less than probable cause, ... [citations omitted] and a protective search ('frisk') which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection." *United States v. King,* 990 F.2d

1552, 1557 (10th Cir.1993); *accord, United States v. Merritt,* 695 F.2d 1263, 1271 (10th Cir.1982), *cert. denied* 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983).

R & R at 1718. And as the magistrate went on to conclude, the authorities cited and the facts as stated in the R & R further support the "pat-down" search of defendant.

Defendants' argument that the continued detention of defendant was not reasonable based on the license plate violation misses the mark. The license plate violation was one of many factors taken into account by the detective. It was not the reason for the stop. The reason for the stop was the stolen property investigation which had the officers looking for a white male in the vicinity of defendant's vehicle. All actions taken by the officers after the initial consensual encounter were clearly reasonably related in scope to this reason for instigating the stop.

Finally, the legality of the search of the defendant's truck was not raised in defendant's objections to the R & R. In any event, the court has reviewed the facts and law relating to the search of the vehicle and finds that the inventory search of the vehicle was consistent with the standards established in *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), Utah state law, and the Fourth Amendment.

■ The jurisdictional question was perhaps the most intriguing issue presented by the motion to suppress. There is no dispute of fact on this issue, the government concedes that the detectives were acting outside their jurisdiction and that the officers did not coordinate their intended "knock and talk" with the Salt Lake County Sheriff's office or any other local police agency. As stated in the R & R, the government specifically states "the detectives did not comply with the relevant state statute." R & R at 23. The only thing before the court then is a question of law as to how the "extra-jurisdictional" actions of the detectives interact with the Fourth Amendment and the established law on suppression of evidence.

The defendant argued that *Ross v. Neff,* 905 F.2d 1349 (10th Cir.1990) is controlling case law for this question and that the warrantless arrest executed outside of the arresting officer's jurisdiction is analogous to a warrantless arrest without probable cause. Hence, the vehicle search incident to the arrest is simply a continuing Fourth Amendment violation justifying suppression. However, the court's review of *Ross,* along with *United States v. Green,* 178 F.3d 1099 (10th Cir.1999), which was relied upon by the magistrate judge, convinces the court that the officer's actions in this instance did not create a Fourth Amendment violation. "[T]he fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended." *Id.,* at 1105, citations omitted.

■ Because the initial encounter with defendant was consensual and the continued detention of defendant and pat-down search were justified under the standards outlined in *Terry,* the inventory search of the vehicle was justified when efforts to contact someone to come and retrieve the truck were unsuccessful.

Accordingly, the court concurs with the findings of the R & R that there has not been a Fourth Amendment violation in this case. The motion to suppress is therefore denied.

## REPORT AND RECOMMENDATION

ALBA, United States Magistrate Judge.

### PROCEDURAL HISTORY

Defendant, Joseph Russell Mikulski, was charged by complaint with one count of

possession of stolen mail, in violation of 18 U.S.C. § 1708. (File Entry # 1.) An arrest warrant was issued on February 17, 2000, and the defendant was eventually presented before United States Magistrate Judge Samuel Alba for an initial appearance on May 16, 2000. (File Entries # 2 and # 5.) On May 24, 2000, the matter was presented to a federal grand jury which returned an indictment charging the defendant with one count of possession of stolen mail, in violation of 18 U.S.C. § 1708. (File Entry # 10.) On June 1, 2000, the defendant again appeared before Magistrate Judge Samuel Alba for an arraignment on the indictment, and he entered a plea of not guilty. (File Entry # 12.) At that time, the matter was further referred to Chief Magistrate Judge Ronald N. Boyce for a pretrial conference, which he conducted on June 30, 2000, at which time the matter was scheduled for a two-day jury trial to begin on August 3, 2000, before District Judge David Sam. (File Entry # 20.)

On July 5, 2000, defendant filed a motion to suppress evidence obtained from him based on the lack of reasonable suspicion to stop, an illegal detention, and a warrantless search. (File Entry # 22.) On July 12, 2000, the government filed a response to the defendant's motion to suppress evidence, wherein the government anticipated that an evidentiary hearing would be required for the court to properly consider the evidence. (File Entry # 23.) The case was referred by the Honorable David Sam to the magistrate judge, pursuant to 28 U.S.C. § 636(b)(1)(B) to conduct hearings, if necessary, to decide any nondispositive pretrial motions, and to submit a report and recommendation regarding any dispositive pretrial motions. Pursuant to that reference, the case was assigned to United States Magistrate Judge Samuel Alba. (File Entries # 24 and # 25.)

A magistrate judge notice of hearing was sent to the parties and an evidentiary hearing was scheduled for 8:30 a.m. on August 4, 2000. (File Entry # 27.) At that hearing, defendant was present and represented by his counsel, Benjamin A. Hamilton. The United States of America was represented by Assistant United States Attorney Leshia N. Lee–Dixon. Testimony was received from Detective Walter Perschon, employed with the Utah County Sheriff's office and Officer Darrin Durfey, also from the Utah County Sheriff's office. At the conclusion of the hearing, the court ordered a transcript of the proceedings. Defendant at that time was also ordered by the court to file a supplemental memorandum in support of the motion to suppress by September 1, 2000. The government was to respond with their memo by September 22, 2000, with the defendant's reply due October 6, 2000. Defendant filed his supplemental memorandum in support of his motion to suppress on September 1, 2000. (File Entry # 32.) The government filed its supplemental response, after a motion to extend the time, on September 26, 2000. (File Entry # 36.) The reply by defendant was filed on October 10, 2000. (File Entry # 37.) After reviewing the memoranda submitted, the court scheduled arguments on the motion to suppress for November 7, 2000. On that date, the defendant was present with counsel, and the government was represented as well. During the hearing, the court raised three issues that still needed further evidence presented. The court pointed out that evidence needed to be introduced as to whether the officers from Utah County conformed their conduct with § 77–9–3 of the Utah Code Annotated. Secondly, the court wanted more information as to the impound policies of both Salt Lake County and West Valley City, and, third, the court wanted more information as to where the pickup truck was taken

after the defendant's arrest while being impounded. At the conclusion of the hearing, defense counsel called Lara Jensen, a witness, who testified concerning where she had to go to pick up the defendant's pickup truck. The testimony was that she picked it up at Adams Towing on about 500 West and 4500 South in Salt Lake County. The court also advised counsel that a new evidentiary hearing was scheduled for November 21, 2000, to allow the government a reasonable opportunity to present evidence addressing the issues the court had raised. (File Entry # 40.) On November 21, 2000, the government recalled Detective Perschon who provided further testimony, and the government also presented Exhibits 4 and 5, the West Valley City Impound and Towing Procedures and the Salt Lake County Impound Procedures. The hearing was again continued to November 30, 2000, to hear from another witness who had not attended the hearing on the 21st. (File Entry # 42.) The hearing on November 30th was continued and conducted on December 6, 2000, at which time defendant did not appear, though he was represented by counsel, and the government was represented. The government offered Exhibit 6, which is a copy of police officers' reports and a copy of the Salt Lake County Impound Policy. The government and the defendant were ordered to file supplemental briefing by January 10, 2001, and a response to that briefing was due January, 19, 2001. The court further advised counsel that after reviewing the supplemental memorandum, the court would decide whether further argument was required. (File Entry # 45.)

On January 10, 2001, a supplemental brief was filed by defendant Mikulski to the motion to suppress evidence based on lack of reasonable suspicion to stop the illegal detention and the warrantless search. (File Entry # 46.) The government filed its supplemental response on January 16, 2001. (File Entry # 48.)

After thorough review of all pleadings, as well as evidence and testimony presented at the different evidentiary hearings on the motion to suppress, the court finds that further oral argument will not be of assistance, and issues the following Report and Recommendation.

## FACTUAL BACKGROUND[1]

On February 9, 2000, at approximately 9:00 p.m., Detective Perschon was assisting other deputies from Utah County in trying to recover stolen property. This property had been stolen from Utah County, but it was now believed to be located in the West Valley–Kearns area of Salt Lake County. An informant had provided information as to the current location of the property, as well as the individual who now had this property in his possession, one Johnnie Green. The detective's purpose in going to Salt Lake County was to try and locate the stolen property and to try and talk to Johnnie Green. (Tr.Vol. 1 at 7–8, 37, 77–78.)

Before going to Salt Lake County, and specifically the address at 4560 West 5780 South, Detective Perschon did not have a physical description of Johnnie Green. On this night, Detective Perschon was working with Detective Darrin Durfey, Detective Richard Case, and Sergeant Jerry

---

1. The facts set forth below are taken from the transcripts of the testimony received at the evidentiary hearings conducted on August 4, 2000 (hereinafter referred to as Tr.Vol. 1 at _____); the transcript of the proceedings on November 7, 2000 (hereinafter referred to as Tr.Vol. 2 at _____); and the transcript of the proceedings of the evidentiary hearing conducted on November 21, 2000 (hereinafter referred to as Tr.Vol. 3 at _____), as well as the exhibits offered by the government and the defendant in this case.

Monson, all from the Utah County Sheriff's office. There were no other officers when they first reached that address from either Salt Lake County or the West Valley City Police Department. (Tr.Vol. 1 at 9–10.)

Detective Perschon, accompanied by Detective Durfey, was driving an unmarked green Jeep when they arrived at the location at approximately 9:00 p.m. Perschon and Durfey positioned themselves in front of the residence in order to have a clear view of the home. Detective Perschon testified that he recognized the neighborhood as being one where he previously had been involved in serving a search warrant for a meth lab, approximately one month prior to this. When Detective Perschon arrived, Detective Case and Sergeant Monson were already at the front door knocking. Monson and Case appeared to be talking to people inside the residence, the porch light was on, and Detectives Perschon and Durfey were acting as security. (Tr.Vol. 1 at 11–12, 19, 78–79.)

After Case and Monson knocked on the door, Detective Perschon received word that Johnnie Green had just left the residence and was not there at that time. Case and Monson went back into the house, apparently to wait. Perschon and Durfey sat in front of the residence for a few more minutes and then decided to move away from directly in front of the residence, waiting to see if Johnnie Green would come back. Perschon did not want to scare Johnnie Green off, and moved the green Jeep a few houses away. At this point, the only physical description Perschon had of Johnnie Green was that he was a white male, who apparently was driving a truck, but did not know the color of the truck. Perschon sat with Durfey waiting outside the home for any traffic that would be approaching, to maintain security on the home, and to offer protec-

tion to the other two officers who were still inside. (Tr.Vol. 1 at 12–15.)

After waiting for approximately 15 minutes, Perschon and Durfey saw two people come out of the house. The individuals were a male and a female. Perschon and Durfey saw them smoking a cigarette, and these two individuals remained outside for approximately five minutes. While these two people were smoking, Perschon and Durfey saw a small truck approach the home from the south. Perschon and Durfey saw that the truck pulled to the left side of the road, opposite traffic, and stopped right before the driveway to the home. An individual got out of the passenger side and began approaching the home. Perschon and Durfey were watching this and were approximately two house lengths away from the truck. (Tr.Vol. 1 at 15–18, 52–53, 79.)

Perschon and Durfey then noticed the two individuals on the porch, gesturing towards the truck, waving the individuals in the truck off with their arms. The individual, who had gotten out of the passenger side of the truck, turned and began to walk back towards the truck, and got back in. The truck did not move. (Tr.Vol. 1 at 17–19, 79–81.)

Both Perschon and Durfey believed that this was suspicious conduct, and thought that Johnnie Green was coming back to the residence. They also believed that the individuals on the porch were warning those in the truck not to come into the home because the police were there. (Tr. Vol. 1 at 19, 69, 74.)

Perschon, at that point, drove up to the side of the pickup truck, not blocking it, and not using emergency lights. Both Perschon and Durfey were in plain clothes. Both detectives got out of the Jeep and approached the truck. Durfey went to the passenger side, Perschon got out, walked around and approached the driver side.

The driver was identified as a male, and the passenger was a female. Both officers identified themselves as police officers and showed their badges on their belts. (Tr. Vol. 1 at 19–20, 24, 79–80.)

Perschon spoke mainly with the driver. Perschon asked the male driver who he was, and the driver answered and gave a first name of Joseph, but no last name. The driver also told Perschon that he did not have any identification. Perschon testified that he had noticed as he approached and walked around the pickup truck that there was not a front plate on the truck, and wanted to verify the driver's identity. Perschon again asked the driver for any identification and the driver, Joseph, again stated that he did not have any. (Tr.Vol. 1 at 20–22, 38–39, 49, 63.)

At this point, Detective Perschon asked the driver to step out of the pickup truck to further check for identification, and stated that based on his experience, an individual saying they do not have identification are trying to hide their name if they have a warrant or are driving on a suspended license. Also, based on his experience, Perschon has found that individuals who do this, in fact have identification on their person. Perschon also took into account the fact that the pickup truck did not have a license plate on the front, he was not getting an identity from the driver, and the suspicious circumstances of the pickup truck being waved off. At this point, the driver got out of the pickup truck. (Tr.Vol. 1 at 22, 40–41, 48.) Perschon testified that he had the defendant step out of the pickup truck in order to search him, to check for identification and also for weapons for officer safety. (Tr. Vol. 1 at 41, 43.) Perschon testified that this was standard, that he checked for his safety first. (Tr.Vol. 1 at 43.) Perschon admitted, on cross-examination, that he had no reason to believe that the defendant was presently armed and dangerous.

(Tr.Vol. 1 at 56–58.) Perschon further testified that even though he did not believe that the defendant was armed and dangerous, his practice and standard procedure was to search the defendant for officer safety. (Tr.Vol. 1 at 58–59.)

Perschon then asked the driver if he had any weapons on his person. Perschon admitted that prior to this time the driver had not made any aggressive acts toward the detective, was nervous, and did not talk in angry tones. In response to the question, the driver told Perschon that he had a knife on his belt. At this point, Perschon asked the driver to put his hands on the door so that the knife could be retrieved. (Tr.Vol. 1 at 23, 44–45.) Perschon then patted down the driver to make sure there were no other weapons. Upon the pat-down, Perschon discovered with his left hand a pistol in the driver's left front pocket. At this time, the driver was placed under arrest. (Tr.Vol. 1 at 23.) The gun contained ammunition, but did not have a round in the chamber. (Tr.Vol. 1 at 23.)

Perschon told the driver not to move, and requested another deputy to assist in securing the weapon. After the weapon was secured, the driver was handcuffed. A further pat-down search occurred and drugs were discovered in the driver's left shirt pocket. (Tr.Vol. 1 at 24.) Perschon also found a wallet on the driver with several pieces of identification, which showed various names. At some point, the driver stated that his name was Joseph Mikulski. The identifications in his wallet had Mikulski's picture with other names. Perschon also found several credit cards in other people's names. (Tr.Vol. 1 at 26.)

A records check to determine if there were any outstanding warrants for Mikulski was requested. Perschon also requested assistance from the Salt Lake County Sheriff's office. Mikulski was placed un-

der arrest when the weapon was found on his person. (Tr.Vol. 1 at 27, 61.) While Perschon was interviewing the defendant, Durfey had a conversation with the female passenger. She gave the detective a name and some identification, and Durfey asked the passenger what she was doing in the pickup truck. She stated that they were there to visit a friend. A warrants check revealed that she did not have any charges pending. She requested that she be allowed to leave the scene, and she left the area. (Tr.Vol. 1 at 28, 82–84.)

After Mikulski was placed under arrest, Perschon asked him if there was anybody he could call to come pick up the truck. Mikulski stated that he did. Perschon testified that he then called a woman with the last name of Jensen, but that he was unsuccessful in attempting twice to get someone to come and pick up the pickup truck. Perschon then determined, based upon his understanding of the department's policy and procedure that the pickup truck would have to be towed and held for the owner, Angela Jensen or Angela Mikulski. (Tr. Vol. 1 at 28–29.)

Perschon testified that following department procedure, he had the pickup truck towed and held for owner. To protect the contents of the pickup truck and for liability purposes, Perschon took an inventory of the pickup truck. In conducting the inventory of the pickup truck, Perschon discovered several items of mail, including credit card statements, bills, and general mail information. (Tr.Vol. 1 at 31–35.)

On November 7, 2000, when the court scheduled the arguments on the motion to suppress, defendant called Lara Jensen concerning the events that occurred on February 9, 2000. Ms. Jensen testified that on the night that Joseph Mikulski was arrested, she received a telephone call from Detective Perschon asking her if she could come up and pick up Joseph's truck. She testified that Perschon gave her a pager number and asked her to return his phone call. The call was left on her answering machine, so it was not until later that she was able to return the call. (Tr. Vol. 2 at 28–29.) She also testified that later she was able to pick up the pickup truck at Adam's Towing at about 500 West and 4500 South in Salt Lake County. She testified that she picked the pickup truck up two days after Mr. Mikulski was arrested. (Tr.Vol. 2 at 29.)

On November 21, 2000, the government again called Detective Perschon to testify. Perschon reiterated that the only information that he had on February 9, had been obtained from other officers and he was there to help them in the investigation. He stated that it was not his case that was being investigated, but another one of the officers. (Tr.Vol. 3 at 102.) Perschon continued testifying that the investigation had been assigned to Detective Case. Perschon stated that Case is the one who provided him the information about the case prior to coming up to Salt Lake County from Utah County. (Tr.Vol. 3 at 103.) Perschon also stated that he is the officer who conducted the inventory search of the pickup truck driver by the defendant on February 9, 2000. Perschon stated that they had contacted Salt Lake County after the defendant had been arrested to try and turn the case over to them, but they did not want the case and so he was left as the officer responsible for taking the inventory of the pickup truck. (Tr.Vol. 3 at 104–105.)

On December 6, 2000, a continuation of the evidentiary hearing was held before the magistrate judge. At that time, there was a stipulation between the parties, and the government offered Government Exhibit 6, which included a copy of the Salt Lake County Sheriff's office incident or initial report, a supplemental report, and the investigation report from the Utah County Sheriff's office prepared by Detec-

tive Richard Case. A review of the materials reflects that the Salt Lake County Sheriff's office was "assisting an outside agency" and that Joe R. Mikulski, a male Caucasian, age 22, was arrested and booked into the Salt Lake County Jail for the charge of possession of a controlled substance with intent to distribute, possession of a concealed weapon, and possession of drug paraphernalia. There is a reference that a Toyota pickup, silver in color, was impounded on a "hold for owner" impound. (See Exhibit 6.) The other portion of Exhibit 6 consists of Detective Case's investigative report of a "knock and talk" at the residence of Johnnie Green at 4560 West 5780 South, Kearns, Utah. Detective Case's report includes information that on December 13, 1999, he began the investigation of a stolen vehicle in Lehi, Utah. His investigation took him to interview an individual by the name of Christopher Thomas who was jailed in Salt Lake City. Thomas told Detective Case that Johnnie Green and others had been in Utah County doing vehicle burglaries and residential burglaries. Thomas told Detective Case that he, Green and another individual were going to Utah County almost every night and doing thefts. Thomas then also informed Detective Case that the property stolen was then taken to Johnnie Green's residence and, more specifically, into the basement there. Thomas also informed Detective Case that the three individuals were trading the stolen property for methamphetamine. As a result of this background information, Case, along with Sergeant Monson, Detectives Durfey and Perschon, on February 9, 2000, went to Johnnie Green's residence at 4560 West 5780 South, Kearns, Utah, to speak with him there. Case included in his report that he and Sergeant Monson went to Johnnie Green's residence and were invited into the house by Green's mother. Initially, they were informed that Johnnie must have left and was not available. Af-

ter a few minutes, however, it was determined that Green was still in the residence and both Case and Monson sat down and spoke with him. While this was going on is when Mikulski and the female passenger approached the outside of the residence and stopped the pickup truck.

## LEGAL ANALYSIS

The defendant bases his motion to suppress on several grounds: (1) The detectives lacked reasonable suspicion to detain the defendant; (2) The detention of the defendant was not lawful or supported by a license plate violation; (3) Detective Perschon's pat-down search of the defendant was illegal; and (4) The Utah County detectives were without jurisdiction to arrest the defendant.

The government, on the other hand, argues that: (1) The detention and questioning of the defendant was a consensual encounter; (2) Perschon asking defendant to step out of the vehicle was justified on reasonable suspicion that illegal activity was going on; (3) Detective Perschon's pat-down search of the defendant for weapons was based on a reasonable concern for his safety; and (4) The Utah County detectives acted in good faith and have not prejudiced the defendant, and have not violated the defendant's constitutional rights.

### A. Standing to Assert Fourth Amendment Claim as to the Search of the Pickup Truck and Seizure of Stolen Mail and False Identifications.

As an initial matter, the court notes that the government has not raised standing as an issue in response to the defendant's challenges to the search of the car. Based on the facts in this case and established Tenth Circuit precedent, the court finds that it must address standing as a threshold matter. It is well established that a

district court may not suppress evidence unless the defendant has satisfied the burden of establishing that he had a personal Fourth Amendment interest in the area searched. *United States v. Jones,* 44 F.3d 860, 871 (10th Cir.1995); *United States v. Martinez,* 983 F.2d 968, 972 (10th Cir. 1992), *cert. denied,* 508 U.S. 922, 113 S.Ct. 2372, 124 L.Ed.2d 277 (1993). Two primary factors are considered in determining whether a search violated a particular defendant's rights: (1) "Whether the defendant exhibited a subjected expectation of privacy in the area searched," and (2) "Whether society is willing to recognize that expectation as being objectively reasonable." *United States v. Soto,* 988 F.2d 1548, 1552 (10th Cir.1993); *Martinez,* 983 F.2d at 973.

Here the evidence establishes that the pickup truck driven by the defendant is registered in his and his mother's name. (File Entry # 22.) *United States v. Arango,* 912 F.2d 441 (10th Cir.1990). The government has not disputed the allegations made by defendant and based on this, the court finds that defendant had a legitimate expectation of privacy in the pickup truck and has standing to directly challenge the search of the truck and the seizure of the items found in the pickup truck.

## B. Initial Contact With Defendant.

The Supreme Court, as well as the Tenth Circuit, have determined that there are three general types of encounters between citizens and the police. These are: (1) Consensual encounters that are not Fourth Amendment seizures since they only involve a person's voluntary cooperation with an officer's non-coercive questioning; (2) Investigative detention, which are Fourth Amendment seizures justified only if there is a reasonable suspicion that the person has committed or is committing a crime; and (3) Arrests which are Fourth Amendment seizures characterized by highly intrusive or lengthy detention and justified only if there is probable cause to believe that a person has committed or is committing a crime. *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Hishaw,* 235 F.3d 565, 569 (10th Cir.2000).

Defendant's argument is that the initial detention of him was illegal. He argues that the detectives in this case were looking for an individual by the name of Johnnie Green. The detectives admitted that they did not have a description of the individual they were looking for, and that they only wanted to interview the individual (Green) since they did not have an arrest warrant for him. The government responds to the argument by stating that Detective Perschon testified that he was familiar with this area of Salt Lake and knew that this was an area where he had previously participated in the search of a methamphetamine lab. Perschon testified that he did not know or have a physical description of Johnnie Green, but he did know and had been told that Green had just left the home and was expected back shortly. Perschon had also been told that Green was a white male. When Perschon saw the pickup truck approach, stop and saw the female passenger exit, and contemporaneously with that saw two individuals on the porch of the house wave in the direction of the pickup truck, and Perschon testified that at this point he believed that Green could possibly be the driver of the pickup.

■ The Supreme Court in *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), recognized that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. In analyzing whether a seizure or a consensual encounter has taken place, a court must consider all the circumstances surrounding the encounter

to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's request or otherwise terminate the encounter. *Id.* The Tenth Circuit, in *United States v. Zapata,* 997 F.2d 751 (10th Cir.1993), enumerated a number of factors to consider in determining whether a police-citizen encounter becomes a seizure. The court stated that we must look at the location of the encounter, "particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officer; whether and for how long the officers retained the defendant's personal effects, such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent." *Id.* at 756. *See, also, United States v. Bloom,* 975 F.2d 1447, 1450 (10th Cir.1992) (The ultimate issue of whether a seizure occurred is a question of law.)

An analysis of the above factors indicate that virtually all of them stand for the proposition that a consensual encounter occurred between Detective Perschon and defendant. First, the encounter occurred in a public setting, on the street in front of Johnnie Green's residence, in view of at least two people on the porch of the residence, and the passenger in defendant's pickup truck. When confronted by the police in such a public place, a reasonable person is less likely to feel that he is unable to decline the officer's request or otherwise terminate the encounter.

It is important to note that neither Detectives Perschon nor Durfey when they approached defendant's pickup truck, did so in a manner that would prevent the truck from leaving. The officers merely pulled up beside the pickup truck. It is clear that at this point there was not show of force or restraint, and the defendant was free to go. The record is also clear that both detectives were in plain clothes, and there is no evidence that they brandished or displayed their weapons. It is also clear from the record that both officers used a regular tone of voice in asking a series of essentially routine questions regarding the identity of the driver (Mikulski) of the pickup truck. *United States v. Ward,* 961 F.2d 1526 (10th Cir.1992).

■ While Mikulski was never informed by Detective Perschon that he need not answer the detective's questions, this one factor by itself does not determine whether a seizure has occurred. It is clear, also, in this case that the encounter was only between Detective Perschon and defendant. Detective Durfey was primarily concerned with interviewing the passenger in the pickup truck. An analysis of all of these factors clearly establishes that the initial approach by Detective Perschon with defendant was a consensual encounter.

### C. Asking Defendant to Step out of the Pickup.

Having established that the initial contact by Detective Perschon with defendant was consensual in nature, the court must now address whether an investigative detention occurred when Perschon asked defendant to step out of the pickup truck.

"In evaluating the reasonableness of an investigative stop, courts are to examine 'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Santillanes,* 848 F.2d 1103, 1107 (10th Cir.1988) quoting

*United States v. Recalde,* 761 F.2d 1448, 1454 (10th Cir.1985). "An officer's 'inchoate and unparticularized suspicion or hunch' is insufficient to give rise to reasonable suspicion." *United States v. Fernandez,* 18 F.3d 874, 878 (10th Cir.1994) quoting *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Thus, in this case, the court needs to decide whether Detective Perschon was aware of specific and articulable facts sufficient to give rise to a reasonable suspicion that the defendant had violated some state statute or that the defendant was involved in some other violation of the law.

In applying the totality of the circumstances test to the facts described above, along with any reasonable inferences that can be drawn from them, this court find that these facts sufficiently give rise to a reasonable, articulable suspicion that the defendant driving the pickup truck and approaching the house could be the person named Green whom the officers were searching for. It should also be noted that as Detective Perschon left his car and walked in front of the pickup truck to address the defendant, who was seated in the driver's side, Perschon had already observed the lack of a license plate on the pickup truck. *Terry,* 392 U.S. at 22, 88 S.Ct. 1868, acknowledges that "a series of acts, each of them perhaps innocent in itself, [may] warrant further investigation." Here the totality of the circumstances provided sufficient justification for the officers to ask defendant out of the truck to question him concerning his identity. They were entitled to determine who he was since he was only providing his first name of Joseph. Perschon testified that based on his training and experience, he knew that oftentimes individuals who want to hide their identity, tell officers that they have none on their person, and do so to try and hide the fact that they may have warrants or suspended licenses. Perschon stated that he asked defendant out of the truck when defendant equivocated in giving basic identification information and because of the lack of a front license plate on the pickup truck. At this point, the court finds that Detective Perschon had a reasonable suspicion that some illegal activity was going on. Asking defendant out of the pickup truck is a minimal intrusion, allowing Perschon to investigate the matter further. It is important to note that "*Terry* has come to stand for two distinct propositions—an investigative detention ('stop') in which a police officer, for the purposes of investigation, may briefly detain a person on less than probable cause, ... [citations omitted] and a protective search ('frisk') which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection." [2] *United States v. King,* 990 F.2d 1552, 1557 (10th Cir.1993); *accord, United States v. Merritt,* 695 F.2d 1263, 1271 (10th Cir.

---

**2.** The rationale underlying this limited warrant exception was explained by the Supreme Court in *Terry* as follows:

> American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more wounded. Virtually all of these deaths, and a substantial portion of the injuries, are inflicted with guns and knives. In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous the officer or to the others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon, and to neutralize the threat of physical harm.

392 U.S. at 23–24, 88 S.Ct. 1868.

1982), *cert. denied* 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983). In order to comport with the Fourth Amendment, the search must have been "reasonably related in scope" to the basis for the stop. (Ascertaining the identity of Mr. Mikulski and determine whether he was Johnnie Green.) *Terry*, 392 U.S. at 20, 88 S.Ct. 1868.

Detective Perschon testified that approximately one month prior to these encounter, he had been in the vicinity of this address and helped in the search of a meth lab. He testified that he was also concerned about the hour (nighttime) and because Mikulski had already admitted that he had a knife on his belt at that point. The Tenth Circuit has established that during an investigatory detention, officers are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo. *United States v. Shareef,* 100 F.3d 1491, 1502 (10th Cir.1996). The court thus finds that Officer Perschon was justified conducting a pat-down search of defendant in this case.

### D. Search of Mikulski's Pickup.

Defendant has also argued that the continued detention of defendant beyond checking for the missing front license plate or the existence of the valid driver's license was illegal. Defendant also argues, therefore, the inventory search performed on the pickup truck was improper, and all evidence found as a result of the illegal

detention and pat-down search is tainted and obtained as an exploitation of the prior illegality. Under those circumstances, any evidence discovered, including the items found in the pickup truck when it was inventoried, are fruit of the poisonous tree and should be suppressed. *Wong Sun v. United States,* 371 U.S. 471, 479, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The Fourth Amendment of the United States Constitution established the fundamental "right of citizens to be secure in their persons, houses, papers, and effects, against reasonable searches and seizures." *U.S. Constitution, Amendment Four.* This right to be free from unreasonable governmental intrusion exists "whenever an individual may harbor a reasonable expectation of privacy." [3] *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Courts have "held that inventory searches are a well-defined exception to the warrant requirement of the Fourth Amendment." *United States v. Kornegay,* 885 F.2d 713, 716 (10th Cir.1989), *cert. denied,* 495 U.S. 935, 110 S.Ct. 2179, 109 L.Ed.2d 508 (1990). This exception arises out of the recognition that automobiles are frequently taken into police custody "in the interest of public safety and as part of what is called the community care-taking function." *Opperman,* 428 U.S. at 368, 96 S.Ct. 3092. An inventory search is intended to secure the automobile's contents for three distinct purposes: (1) To protect the

---

3. Courts have traditionally recognized that a person may have a legitimate expectation of privacy in the contents of his car. *Delaware v. Prouse,* 440 U.S. 648, 662–663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). However, there are some circumstances where courts uphold warrantless searches of automobiles in situations where a similar search of a person's home or office would be found unconstitutional. *See South Dakota v. Opperman,* 428 U.S. 364, 368, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). The rationale underlying such a differential approach to automobiles is based on

several factors: (1) The inherent mobility of automobiles creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible; (2) The expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office; and (3) Automobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements. *Id.* at 367–368, 96 S.Ct. 3092.

owner's property while it remains in police custody; (2) To protect the police from claims of lost or stolen property; and (3) To protect the police from potential danger. *Id.* at 369, 96 S.Ct. 3092.

In *Opperman* the Supreme court considered whether a warrantless inventory search of an impounded car is reasonable under the Fourth Amendment. The court determined that such a search is not unreasonable when it is performed in accordance with established standard procedures that are designed to secure and protect the owner's car and its contents. *Id.* at 373, 376, 96 S.Ct. 3092. The importance of such a search being done in accordance with "standardized criteria" or "established routine" was stressed in *Florida v. Wells,* 495 U.S. 1, 4, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990), where the court emphasized that:

> Our view the standardized criteria . . . or established routine, . . . must regulate the opening of containers found during inventory searches is based on the principle that an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence. The policy or practice governing inventory searches should be designed to produce an inventory. The individual police officer must not be allowed so much latitude that inventory searches are turned into a purposeful and general means of discovering evidence of crime.

*Id.*

In this case, where defendant has challenged the search and seizure of items from his truck, as violative of the Fourth Amendment, the burden is on the government to prove that the warrantless search falls within the "inventory search" exception. *United States v. Ibarra,* 955 F.2d 1405, 1408 (10th Cir.1992); *United States v. Carreon,* 872 F.2d 1436, 1441 (10th Cir. 1989). Thus, the primary issues before the court are: (1) Whether the government has demonstrated that there was adequate justification for the impoundment of defendant's truck and (2) Whether the government has shown that the inventory search was conducted pursuant to established departmental procedures of government inventory searches of impounded vehicles.

Utah State law provides that an officer may seize or take possession of vehicle under certain enumerated circumstances. Included in these circumstances is where the person responsible for the vehicle is unable to provide for its custody or removal (Utah Code Ann. § 41–6–102(3)(b)) and where the person operating the vehicle is arrested for an alleged offense for which the officer is required by law to take the person arrested before a proper magistrate without unnecessary delay. (Utah Code Ann. § 41–6–102(3)(c)). Here, the reason listed on the Salt Lake County Sheriff's office initial report, dated February 9, 2000, (and Government's Exhibit 6) was that the pickup truck was impounded "on a hold for owner."

Detective Perschon testified that upon the pat-down search of defendant he found a gun in defendant's pocket. Upon finding the gun, the defendant was arrested. Perschon asked defendant if he had anyone who could come and take the truck. Defendant gave him a name and a number and Perschon twice called that number but was unable to locate anyone to come and take the truck from the street. Under those circumstances, it was reasonable for Perschon to call the Salt Lake County Sheriff's office for backup. Based on Perschon's information, Salt Lake County Sheriff's office transported defendant and booked him into the jail, and they also called Salt Lake County Sheriff's office dispatch and had Lake City Towing respond and impound the pickup truck as a "hold for owner." *Id.*

The court here finds that the decision to impound the truck was reasonable where the defendant was under arrest at the time that the requests for impound was made of the Salt Lake County Sheriff's office and attempts had been made to contact someone to come and retrieve the truck, which had proved unsuccessful. An analysis of the established departmental procedures, governing inventory searches of impounded vehicles, which had been provided to the court (including the procedures for Salt Lake County, Utah County, and West Valley City) all establish that a standardized set of procedures was in operation here, and the police did not act arbitrarily in selecting places within the truck to search. In order for the procedures governing inventory searches to be deemed reasonable under the Fourth Amendment, they should be geared "toward securing or protecting the car and its contents." *Opperman*, at 373, 96 S.Ct. 3092. Inventory searches conducted in accordance with these types of standard procedures will "ensure that the intrusion will be limited in scope to the extent necessary to carry out the care-taking function." *Id.* at 375, 96 S.Ct. 3092.

The court specifically finds that the warrantless search of the pickup in this case is not in violation of the Fourth Amendment, and that it falls squarely under the "inventory search" exception.

### E. Utah County Detective's Authority to Arrest Defendant.

Defendant argues that the incriminating evidence obtained from the arrest of the defendant and the search of his pickup should be suppressed because the Utah County police officers were acting outside their jurisdiction and contrary to law. It is evident, and the government concedes that the detectives here were acting outside their jurisdiction. The government goes on to concede as well that the officers did not coordinate their intended "knock and talk" with the Salt Lake County Sheriff's office or any other local police agency. The government specifically states "the detectives did not comply with the relevant state statute." (File Entry # 48, Government's Supplemental Response to Defendant's Motion to Suppress Evidence.)

Defendant complains that Utah Code Ann. § 77–9–3 has been violated. The statute provides that:

(1) Any peace officer authorized by any governmental entity of this state may exercise a peace officer's authority beyond the limits of such officer's normal jurisdiction as follows:

(a) When in fresh pursuit of an offender for the purpose of arresting and holding that person in custody or returning the suspect to the jurisdiction where the offense was committed;

(b) When a public offense is committed in such officer's presence;

(c) When participating in an investigation of criminal activity which originated in the officer's normal jurisdiction in cooperation with the local authority.

In analyzing this issue, the Tenth Circuit in *United States v. Green*, 178 F.3d 1099 (10th Cir.1999), held that the exclusionary rule is only concerned with deterring federal constitutional violations. Therefore, in *Green*, as in this case, where state police officers acting outside their jurisdiction is at issue, the court looks to see that the standards developed under the Federal Constitution have not been offended. *Id.* at 1103. The court went on to state that even if the state statute had been violated, that would not have ended the inquiry, because the authority in a federal case for suppressing evidence due to an unlawful search is the Fourth Amendment to the Federal Constitution. A violation of state law may or may not

form the basis for suppression on Fourth Amendment grounds. *Id.* at 1105–1106.

Based on the analysis that this court has reviewed *ante*, there has not been any Fourth Amendment violation. The Fourth Amendment is satisfied, where the initial contact with Mikulski was a consensual encounter, which disclosed sufficient reasonable suspicion to escalate the encounter to a *Terry*-type stop for conducting a pat-down search of the defendant. The court has further found that the inventory search of the truck in this case was justified when attempts were made to contact someone to come and retrieve the truck, and those two contacts were unsuccessful. In sum, there has not been a Federal Constitutional Fourth Amendment violation in this case.

### RECOMMENDATION

The court finds that Detective Perschon's initial contact with Mikulski in this case was consensual in nature. The court also finds that Perschon's initial questioning of the defendant gave rise to a reasonable suspicion that something criminal may be afoot. Under these circumstances, Perschon was justified in asking Mikulski out of the truck, and the pat-down search that occurred at that point was justified under *Terry*. In response to a question by Perschon, Mikulski admitted that he had a knife on his belt, and the pat-down search revealed a gun in his pants pocket.

The court also finds that the inventory search of the truck was reasonable under the circumstances when efforts were made to contact someone to come and retrieve the truck proved unsuccessful. Therefore,

**IT IS HEREBY RECOMMENDED** that defendant's Motion to Suppress Evidence be **DENIED.**

Copies of the foregoing Report and Recommendation are being mailed to the parties who are hereby notified of their right to object to the same. The parties are further notified that they must file any objections to the Report and Recommendation with the clerk of the district court, pursuant to 28 U.S.C. § 636(b), with ten (10) days after receiving it. Failure to file objections may constitute a waiver of those objections on subsequent appellate review.